Weygandt, C. J.
According to the evidence of the plaintiffs they jointly used a bag or sack supplied by the defendant bank for the special purpose of making its night depository available to customers desiring that service.
This arrangement had been in existence for several years.
The plaintiffs testified that on the night of Saturday, March 15, 1947, they placed a sum of money and several checks in their sack bearing the serial number 29. They stated that they took the sack to the bank building, opened a small metal door in the outer wall, and placed the sack in a chute which sloped downward into a special vault or safe inside the bank.
According to the evidence the bag was not seen again.
Two days later on Monday, March 17, one of the plaintiffs went to the bank during the forenoon for the purpose of opening the sack and depositing the money and checks. The employees of the bank searched for the sack but it was not found.
The controlling question before this court is the effect of the provisions of the written contract between the plaintiffs and the defendant bank. It reads in part as follows:
“The undersigned hereby agrees to use the night depository facilities only for overnight keeping of sacks, which sacks shall contain nothing other than currency or commercial paper, or both, and further agrees that a person authorized by the undersigned will call at the bank to receive and receipt for said sack (s) on the first banking'day following each placing by or on behalf of the undersigned of any sack in the night chute. Bank shall have no duty or obligation whatsoever to see that the contents or any part thereof of any sack is tendered for deposit for credit to any *29 account with bank, nor to ascertain the contents or disposition of contents of any sack receipted for by any authorized person.
“The undersigned expressly understands and agrees that each use or attempted use by the undersigned of the night depository facilities shall be at the undersigned’s sole risk at all times and further expressly understands and agrees that the relationship of debtor and creditor between bank and undersigned shall not arise out of any use or attempted use of the night depository facilities, each separate use by the undersigned of the night depository facilities being deemed to have been completed each time any sack herein-above listed found in the night receptacle by bank is receipted for by any authorized person.”
The defendant contends that this contract is valid and that it is authorized by the provisions of Section 710-110, General Code, which read as follows :
“A bank may receive on deposit for safekeeping in its vaults and safes, or in the vaults and safes of another bank in this state, securities, stocks, bonds, coins, plate, jewelry, books, papers, documents and other valuable papers and property, upon such terms and conditions as it may prescribe.”
As to this the Court of Appeals in the majority opinion made the following comment:
“This statute seems broad enough to include the right of a bank by contract to provide upon what terms it will make available facilities for making deposits in night deposit vaults to be used during the time when the bank is not open. But if by strict interpretation it should be construed not to extend its provisions to night depositories, this section of the General Code of Ohio at least establishes a legislative policy to permit banks to enter into contracts limiting common-law liability with respect to securities de *30 posited with it for safekeeping in its vaults. Such a service is one rendered in the interest of a customer who would otherwise be compelled to face the risk that attends the possession of large sums of money in the night season in the regular conduct of his business.
“Of necessity, no one representing the bank is present when a night deposit is made. Whether such deposit has actually'been made must be established in every event by the evidence of the depositor. It would therefore be a very natural position of the bank to take that until the sack is actually accounted for by the bank’s clerks in the ordinary procedure of accounting for night deposits sacks, such deposits should be at the risk of the depositor. Such a contract is not void as against public policy.”
It is not necessary to base this decision on the quoted statute. In 175 A. L. R., 110, appears the following summary of the pertinent law:
“The modern development of the law of bailments and its extension to many new and varied transactions as a result of the increasing complexity of today’s commercial relationships is reflected accurately in the position the courts take in regard to the exculpatory clauses found so frequently in bailment contracts. While the right of the ordinary bailee to make a contract exempting him from liability due to his negligence or the negligence of his employees is recognized with practical unanimity, a strong tendency to hold such contracts void as violative of public policy is noticeable in the decisions of the courts which deal with contracts of bailment for hire entered into by the bailee in the course of a general dealing with the public; and this tendency becomes more pronounced the more recent the decisions, although there is still respectable authority for the view that such provision may be valid against all but gross negli *31 ¿ence. Bailees of the second type, as this term is understood here, are persons who make it their principal business to act as bailees and who deal with the public on a uniform and not an individual basis as evidenced by the fact that their contracts, as a rule, are printed on identification tokens or are posted in their place of business. The chief representatives of this type of bailees are owners of parcel checkrooms, owners of parking places, garagemen, and warehouse-men. ’ ’
The plaintiffs rely on the decision of this court in the case of Agriculture Ins. Co. v. Constantine, 144 Ohio St., 275, 58 N. E. (2d), 658, in which it was held in paragraph three of the syllabus:
“Where, at the time of bailment and ostensibly for later identification of the bailed property, a bailee delivers to a bailor a token or receipt upon which conditions are printed purportedly limiting the bailee’s liability, such printed conditions become no part of the contract of bailment and the parties remain subject to the usual obligations imposed by law, in the absence of anything to indicate that the bailor either expressly or impliedly assented to such printed conditions, prior to or contemporaneously with delivery of the property to the bailee. ’ ’
That case is distinguishable from the instant ones in several respects. That case involved an individual engaged exclusively in the business of parking automobiles for hire. In that case there was no written agreement whose terms were known to both parties, as in the instant controversy. In that case the automobile admittedly was delivered into the custody of the bailee, while in the instant litigation the defendant insists that it never received the sack containing the plaintiffs’ money and checks.
The Court of Appeals was not in error in its view *32 that “ where the circumstances are such that the possession of another’s property is attended with unusual risks, the parties dealing at arm’s length as free agents may lawfully make any reasonable provision therefor as the circumstances justify.”

Judgments affirmed..

Zimmerman, Stewart, Middleton, Matthias, and Hart, JJ., concur.
Taft, J., not participating.